**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RONDA WASHBURN, et al.,**

**Plaintiffs,**

**v.**

**CPS SOLUTIONS, LLC,**

**Defendant.**

**Case No. 2:25-cv-400**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Shimeall**

## OPINION AND ORDER

CPS Solutions markets pharmacy technology services to healthcare providers and pharmacies. When a patient obtains healthcare or pharmacy services from one of CPS's clients, the patient must provide certain personal information. In turn, CPS's healthcare provider or pharmacy client forwards the patient's data to CPS when it uses CPS's services. Plaintiffs—Ronda Washburn, Danielle Webber, and Jodi Pierce—were among the patients whose data was forwarded on to CPS. They sued CPS on behalf of a putative class, alleging that CPS, by taking shoddy data security measures, allowed bad actors to obtain some or all of the information the plaintiffs had given to their healthcare providers. (Am. Compl., Doc. 18). CPS now moves to dismiss that suit, (Doc. 30), and it also asks the Court to stay discovery pending the Court's decision on its motion to dismiss, (Doc. 29). For the reasons explained below, the Court **GRANTS** in part and **DENIES** in part CPS's Motion to Dismiss (Doc. 30), and it therefore **DENIES** CPS's Motion to Stay Discovery (Doc. 29) as moot.

## BACKGROUND

CPS provides "pharmacy operational technologies and solutions" to hundreds of healthcare facilities from its headquarters in Ohio.[1] (Doc. 18, #135). Plaintiffs are citizens of New York. (*Id.* at #134). Before plaintiffs could get healthcare services from CPS's clients, they had to provide CPS's clients with certain private information. (*Id.* at #135). This included personally identifiable information (PII), which is information such as government-issued ID numbers, names, addresses, and dates-of-birth. (*Id.* at #135, 130 & n.1). Plaintiffs also turned over protected health information (PHI), such as medical records and insurance information. (*Id.* at #135, 130). Altogether, plaintiffs refer to this as "Private Information" (PI). (*Id.* at #139).

Plaintiffs allege when they disclosed their PI, they did so "with the reasonable expectation and mutual understanding" that CPS would keep the "information confidential and secure from unauthorized access." (*Id.* at #135–36). That made a notice that they received from CPS particularly upsetting. In the notice, CPS told plaintiffs, as well as other "potentially affected individuals," that "an unauthorized third-party was able to access and remove data" from a CPS employee's email account. (*Id.* at #137). The notice further informed recipients that the affected data "may have included: (1) full name, date of birth, and address; (2) health insurance information ...; and/or (3) medical information." (*Id.*). The notice went on to qualify

[1] Because this matter is before the Court on CPS's motion to dismiss (Doc. 30), the Court must accept the well-pleaded allegations in the complaint as true. *See Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). So while the Court relies on plaintiffs' allegations to recount the case's background, it reminds the reader that they are just that—allegations.

this, however. It says that "[n]ot all data elements were involved for every potentially affected individual," and that for most "potentially affected individuals, [SSNs] were not impacted." (*Id.*). Further, the hackers did not access "[d]river's license numbers, credit and debit card information, bank account information, test results, images, and hospital medical records." (*Id.*).

This was cold comfort for plaintiffs. Compounding the risk of their personal data being exposed, they point out that CPS did not send the notice until four months after it learned of the data breach. (*Id.* at #138). Further, the notice does not say how the breach happened or how class members should've proceeded at that point. (*Id.*).

Plaintiffs charge that the data breach has materially affected them. They allege that it increased the chances that they will experience identity theft, that they've spent significant time and money trying to mitigate their risk of identity theft, and that these challenges will continue well into the future. (*Id.* at #148–50). These particular plaintiffs add details as well. Washburn says that she generally is very careful about sharing her PI and that she has spent significant time trying to mitigate the impact of the data breach. (*Id.* at #154–55). Further, she says that she now fears for her financial security and privacy with regard to her medical information. (*Id.* at #155). She says that this anxiety and stress has caused her to lose sleep. (*Id.*). Plaintiffs Webber and Pierce both say they've experienced the same problems as Washburn. (*Id.* at #156–59). But they both add that, shortly after the data breach occurred, they faced financial fraud, found various private information on the dark web, and received increased scam communications. (*Id.*).

And all three say that CPS caused all of this by failing to use "reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining." (*Id.* at #138). In particular, they say CPS at least should have "encrypt[ed] the information or delet[ed] it when it [was] no longer needed." (*Id.*). Plaintiffs note that they generally "take[] reasonable steps to maintain the confidentiality of their [PI]," and that they "relied on [CPS]" to do the same. (*Id.* at #139). The need for CPS to take reasonable steps to prevent data breaches was particularly pressing, they say, because of the "substantial increase in cyber-attacks and/or data breaches targeting entities … that collect and store [PI] preceding" this data breach. (*Id.* at #140). And to make matters worse, entities that store medical information, plaintiffs say, "reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach." (*Id.* at #141).

In short, plaintiffs say that CPS knew, or at least should've known, that this might happen. (*Id.* at #142). So they sued on behalf of a putative nationwide class of "[a]ll individuals whose [PI] was accessed and/or acquired by an unauthorized party in the Data Breach, including all who were sent a notice of the Data Breach." (*Id.* at #160). CPS now moves to dismiss the case. (Doc. 30). That matter is now fully briefed and ripe for the Court's review. (Pls.' Resp., Doc. 40; Def.'s Reply, Doc. 42).

## LEGAL STANDARDS

CPS moves to dismiss this action under Civil Rules 12(b)(1) and 12(b)(6). Ultimately, the standard the Court employs to analyze each of CPS's arguments is

"similar." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). But the two inquiries remain separate.

Start with the former. CPS's motion challenges plaintiffs' standing to sue, and thus it attacks the Court's subject-matter jurisdiction under Rule 12(b)(1). (Doc. 30, #264). A motion under that rule can mount either a facial attack, which argues that the plaintiff has not adequately pleaded jurisdiction, or a factual one, which argues that facts necessary for jurisdiction do not exist, even if the plaintiff pleaded them properly. *Ohio Nat'l*, 922 F.2d at 325. Here, CPS raises a facial attack. (*See* Doc. 30, #264). So, in reviewing the motion, the Court "must accept all allegations as true," except that it need not credit "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016) (quoting *O'Bryan v. Holy See*, 556 F.3d 361, 375 (6th Cir. 2009)). But the motion should be granted if the well pleaded factual allegations do not provide a sound basis for federal jurisdiction.

Now move on to CPS's merits argument. To survive a motion to dismiss under Rule 12(b)(6), plaintiffs must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a "plausible" claim for relief does not require a showing of *probable* liability, it requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.* Plaintiffs must allege sufficient facts for the Court to "draw the reasonable inference that the defendant is liable." *Id.* As for CPS's 12(b)(1) motion, the Court accepts the facts

alleged in the amended complaint as true. *Id.* But the Court will disregard "naked assertion[s]" of fact and "formulaic recitation[s] of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 557.

**LAW & ANALYSIS**

Plaintiffs, acting on behalf of a proposed nationwide class of individuals who received the notice, (Doc. 18, #160), originally brought five (or, more accurately, four) claims. Count I is for common-law negligence. (*Id.* at #164–68). Count II, while separately alleged, is in fact that same negligence claim, just repackaged with a per se theory of liability based on federal statutes and regulations. (*Id.* at #168–70). Counts III and IV are respectively for breach of fiduciary duty and breach of contract (the latter on a third-party beneficiary theory). (*Id.* at #170–73). Finally, Count V is for unjust enrichment. (*Id.* at #173–75). In addition to damages, plaintiffs seek extensive injunctive relief based on these claims. (*Id.* at #175–78). CPS moves to dismiss all of these claims.

Plaintiffs' response to CPS's motion, though, narrows the suit considerably. There, plaintiffs ask the Court to dismiss counts II through IV without prejudice. (Doc. 40, #352). The Court grants that request. So that leaves two claims to resolve here: plaintiffs' claims for negligence (Count I) and unjust enrichment (Count V). As noted earlier, CPS mounts two lines of attack on those claims. First, it argues that plaintiffs lack standing, and second, it says the claims fail on the merits anyway. As it must, the Court begins with the jurisdictional argument. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

### A. The Court Has Subject-Matter Jurisdiction.

While CPS challenges jurisdiction exclusively on the basis that plaintiffs lack standing, the Court starts with the broader picture. For jurisdiction to exist, the Court must find two things. First, Congress, by statute, must have granted the Court the power to hear the case. On that front, because none of plaintiffs' claims arise under federal law, they need to meet the statutory requirements for diversity jurisdiction under 28 U.S.C. § 1332. Then, after the Court addresses that question, it will turn to standing, a constitutional hurdle.

#### 1. Diversity Jurisdiction under CAFA

It turns out the statutory question is easy. The Class Action Fairness Act, subject to other requirements not in question here, provides for jurisdiction if (1) there is minimal diversity among class members and defendants (i.e., at least one person on one side of the 'v,' has different citizenship from at least one person on the other side), and (2) the amount in controversy is greater than $5,000,000. 28 U.S.C. § 1332(d). Here, both are met. The amount in controversy exceeds $5,000,000 because plaintiffs, apparently in good faith, alleged that amount. (Doc. 18, #134); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938). And minimal diversity is met because all three plaintiffs are citizens of New York, (Doc. 18, #132–33), and CPS, a Delaware-organized LLC headquartered in Ohio, is a citizen of Delaware and Ohio. 28 U.S.C. § 1332(d); *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).[2] So CAFA empowers the Court to consider this case.

[2] In ordinary cases, an LLC's citizenship is the same as that of each of its members. *Akno 1010 Mkt. St. St. Louis Mo. LLC v. Pourtaghi*, 43 F.4th 624, 627 (6th Cir. 2022). CAFA

**2. Standing**

That leaves the second jurisdictional question, which is constitutional. For this case to proceed, at least one of the named plaintiffs needs standing to sue for each form of relief sought. *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 315 (6th Cir. 2025) (en banc). Ultimately, the Court concludes that two of them—Webber and Pierce—have it. But it takes a bit to explain why that is so.

The Court starts with the basics. Federal courts can decide only "Cases" and "Controversies." U.S. Const., art. III, § 2; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). This means that federal courts can decide only "the rights of individuals." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Standing is one part of that limitation, and it has three elements. Plaintiffs must show (1) an actual or imminent, concrete, and particularized injury in fact that is (2) traceable to the challenged conduct of the defendant, and (3) likely redressable by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61; *TransUnion*, 594 U.S. at 423.

Plaintiffs must show these elements "in the same way as any other matter on which" they "bear[] the burden of proof." *Lujan*, 504 U.S. at 561. That is, by the "manner and degree of evidence required at successive stages of the litigation." *Id.* Hence, at the motion-to-dismiss stage, plaintiffs are required to "allege facts that plausibly support [each] element of standing." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 87 F.4th 315, 320 (6th Cir. 2023). And one more point bears

changes this however; in cases it governs, an "unincorporated association['s]" citizenship is determined as though it were a corporation. *See* 28 U.S.C. §§ 1332(d)(10). And seemingly nobody doubts that LLCs are unincorporated associations under CAFA. *See City of E. St. Louis v. Netflix, Inc.*, 83 F.4th 1066, 1071 (7th Cir. 2023) (collecting cases).

mention: "standing is not dispensed in gross," which means those three elements must be present for at least one plaintiff for each claim and each form of relief plaintiffs seek. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). So, for example, if each plaintiff seeks separate damages, then each plaintiff must show standing as to the damages they seek. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439–40 (2017)

So, putting that all together, for each form of relief at least one plaintiff must have alleged facts plausibly supporting an inference that they suffered a cognizable Article III injury which was traceable to CPS's challenged conduct and which the Court could redress by ruling in plaintiffs' favor. *See du Pont C-8 Litig.*, 87 F.4th at 320. Trying to meet that challenge, plaintiffs propose several theories of injury. Only some work.

**a. Some Plaintiffs Plausibly Allege Standing Based on Actual Misuse of Their Private Information.**

The Court begins with plaintiffs' allegations that they suffered various misuses of their PI, leading to economic losses and emotional distress. Only two plaintiffs, Webber and Pierce, allege such harm; Washburn does not. (Doc. 18, #154–55). As for Webber, she claims that (1) someone made a fraudulent credit account inquiry in her name, (2) she found her email addresses and passwords on the dark web, (3) she learned of multiple fraudulent charges on her credit card, and (4) she has dealt with increased scam communications since the data breach. (*Id.* at #156). And Pierce says that (1) there was a fraudulent charge on her bank account, (2) her private information was on the dark web, (3) there were unauthorized login attempts on her

social media account, and (4) she suffered an uptick in scam communications. (*Id.* at #158–59). Both also allege that they had to get new bank or credit cards and forgo access to money or credit, if briefly. (*Id.* at #156, 158).

Start with standing's first element, an injury. For that requirement, a plaintiff must plausibly allege that they have suffered "an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423. Some harms are obviously concrete; chief among these are pecuniary and physical injuries. *Id.* at 425. But beyond that, "[v]arious intangible harms can also be concrete." *Id.* at 425. Specifically, an intangible harm can be concrete if it has "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)). But plaintiffs need not demonstrate that a traditional common-law harm is an "exact duplicate" for their injury. *Id.* at 433. That is, their injury does not have to actually give rise to, for example, a cause of action in tort, as long as plaintiffs' asserted harm still "'exist[s]' in the real world." *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018). So, in assessing whether any of plaintiffs' intangible harms are concrete, the Court must look for "a 'close relationship' *in kind, not degree*." *Dickson v. Direct Energy, LP*, 69 F.4th 338, 344 (6th Cir. 2023) (quoting *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)).

Applying those principles, Webber and Pierce have plausibly alleged concrete injuries as to this form of alleged harm. First, their allegations support a plausible inference that they suffered identity theft. In particular, the alleged unauthorized

financial transactions and efforts to open fraudulent credit cards suggest that identity theft at least might have happened here. *In re Bon Secours Mercy Health Data Breach Litig.*, No. 1:24-cv-594, 2025 WL 1827804, at *5 (S.D. Ohio July 2, 2025). And that qualifies as a concrete injury. *Id.* (collecting cases). Second, increased scam texts, calls, and emails are concrete injuries because, as the Sixth Circuit has held, they are akin to the injury involved in the common-law tort of intrusion-upon-seclusion. *Dickson*, 69 F.4th at 345. For the third—lost time without access to bank or credit accounts—the Court need not resort to common law analogizing. Webber and Pierce have standing on this theory because "the principle that the time value of money is 'money or property' controls." *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 829 (7th Cir. 2018) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)).

Webber and Pierce also show traceability. For this, they must have alleged that each injury "was likely caused by the defendant." *du Pont C-8*, 87 F.4th at 320 (quoting *TransUnion*, 594 U.S. at 423). To support that, Webber and Pierce each allege that they are "very careful about sharing [their] sensitive [PI]," including storing it "in a safe and secure location," and "never knowingly transmit[ing]" it in unencrypted form. (Doc. 18, #155–56, 158). Further, plaintiffs allege that "[c]riminals … sell[] the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes." (Doc. 18, #149).

The Court concludes that this is sufficient, at least at the pleading stage. Plaintiffs allege that CPS's breach could well have exposed several pieces of information that are relevant here—full names, DOBs, addresses, and SSNs. (Doc. 18, #137). Admittedly, those pieces of information, in and of themselves, would not enable a bad actor to make scam communications or commit financial fraud. But plaintiffs, as hinted at above, point out that identity theft is a piecemeal process. (Doc. 40, #356–57). The Court has observed elsewhere that bad actors can obtain some information about individuals through a data breach and then obtain the rest by other means, which ultimately would give them a comprehensive enough data set to commit the fraudulent transactions and scam communications alleged here. *See Mercy Health*, 2025 WL 1827804, at *6 (finding traceability at least where additional identifiers beyond an SSN, like names and addresses, were exposed); *cf. Doe v. Mission Essential Grp., LLC*, No. 2:23-cv-3365, 2024 WL 3877530, at *7 (S.D. Ohio Aug. 20, 2024) (rejecting this theory where the plaintiff had only alleged exposure of his name and SSN).

And it is not fatal to their efforts to show standing that plaintiffs do not affirmatively allege that their SSNs or other information were accessed. Their allegations of misuse indicate that this information was exposed; and their allegations about how protective they are of PI eliminates alternate causes. And both Webber and Pierce allege dark web and other shenanigans involving their email addresses, which suggests that at least some of the information needed to target them was otherwise available. (Doc. 18, #156–57, 158–59). So there is at least more than a

"sheer possibility" that their down-the-line injuries of this ilk are traceable to the data breach. *Iqbal*, 556 U.S. at 678. Whether this inferential chain can be proven is a question for a later date. For now a reasonable inference suffices.

Finally, redressability is easily met because plaintiffs seek money damages for these injuries, which the Court can award if they succeed on the merits. So Webber and Pierce have standing based on fraudulent transactions, lost access to accounts, and increased scam communications.

**b. Some Plaintiffs Plausibly Allege Standing Based on Losses Caused by a Risk of Future Harm.**

Many of plaintiffs' other theories of standing can succeed only if plaintiffs show that they face a sufficiently high risk of the future injury that they allege. And even then, there are limits. For example, the Supreme Court has stated that "damages claims based on an asserted risk of future harm" do not suffice for standing purposes. *TransUnion*, 594 U.S. at 437. So risk, in and of itself, is not enough. But, if a plaintiff can show that the risk they identify "independently harmed" them somehow (e.g., by inflicting emotional harm or forcing plaintiffs to take reasonable mitigation measures), then they can seek damages for those independent injuries so long as the future harm is sufficiently likely to happen. *Id.* Turning to injunctive relief, standing on that front also requires that the requested injunction remedy either ongoing harm or a strong likelihood of imminent future harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Thus, plaintiffs' standing depends on the likelihood and imminence of the future injuries they fear would spring from the data breach. Specifically, to the extent they are claiming harm from expenses incurred in mitigating the potential for

future harm the data breach created, or claiming emotional distress injuries based on the fear they felt contemplating that risk of future harm, they must show both the likelihood and imminence of such harm. The same goes for plaintiffs' requests for injunctive relief.

Start with the plaintiffs' damages claims. For these, plaintiffs allege that they spent time and money mitigating the risk that they will suffer identity theft or financial fraud as a result of the breach. (Doc. 18, #155, 157, 159). So standing for those losses hinges on finding (1) a sufficiently high risk of imminent identity theft and financial fraud and (2) that CPS's alleged misconduct caused that injury (i.e., that the injury is traceable to this data breach). To assess whether plaintiffs can make that required showing, the Court must first identify the degree of likelihood and imminence required. The Supreme Court has not described this requirement with complete consistency, but the basic picture is that "[w]hile plaintiffs are not required 'to demonstrate that it is literally certain that the harms they identify will come about,' a 'possible future injury'—even one with an objectively reasonable likelihood' of occurring—is not sufficient." *Clemens v. ExecuPharm, Inc.*, 48 F.4th 146, 153 (3d Cir. 2022) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013)). When analyzing this issue in data breach cases, this Court, following others, often considers the three *McMorris* factors—(1) whether the breach was intentional, (2) whether the data was misused, and (3) the nature of the information accessed through the breach. *See McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 301–02 (2d Cir. 2021); *Savidge v. Pharm-Save, Inc.*, 727 F. Supp. 3d 661, 681 (W.D. Ky. 2024); *Mercy Health*,

2025 WL 1827804, at *4–5; *Tate v. EyeMed Vision Care, LLC (Tate II)*, ___ F. Supp. 3d ___, 2026 WL 2794795, at *6–7 (S.D. Ohio 2026).

Applying those factors, the Court concludes once again that Washburn has not plausibly alleged that she is at risk of "certainly impending" identity theft. *Clapper*, 568 U.S. at 414 n.5. But Webber and Pierce have.

The first factor favors all three plaintiffs equally. Their allegations, as well as CPS's notice, suggest that the hackers broke into a CPS employee's business email account and "access[ed] and remove[d] data from the account." (Doc. 18, #137). That's no worse than most data breaches, true, but it at least shows that the wrongdoers carried out an intentional cyberattack intended to extract data from CPS's account.

The second element is favorable (but only for Webber and Pierce). As noted above, those two allege various misuses of their data. Webber alleges that bad actors attempted to open a credit account in her name and caused fraudulent subscription charges to appear on her credit cards. (*Id.* at #156). She also alleges that her email addresses and the passwords for them had been found on the dark web. (*Id.*). In that same vein, Pierce points to fraudulent transactions on her bank account, finding her information on the dark web, unauthorized login attempts on her social media, and increased spam communications shortly after the breach. (*Id.* at #158–59). As the Court explained above in addressing misuse, *supra* Part A.1, Webber and Pierce, because of the implications of the fraud and scam communications they've suffered, have at least set out a plausible story on traceability. Washburn, on the other hand, has not alleged anything to bridge the gap between her allegations that some of her

information might have been accessed and the equally plausible story that none of it was. *See Twombly*, 550 U.S. at 557.

Finally, the third *McMorris* factor—the nature of the data—again supports Webber and Pierce, but not Washburn. As a general matter, plaintiffs whose SSNs were exposed face non-speculative, imminent harm. *See Tate II*, 2026 WL 2794795, at *7. But unlike cases where courts upheld standing because of SSN exposure, *see id.*; *Savidge*, 727 F. Supp. 3d at 689–90; *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 288 (2d Cir. 2023), Washburn, Webber, and Pierce do not allege that their SSN was exposed. Rather, they allege only that they *might be* among the minority "of potentially affected individuals" for whom SSNs were impacted. (Doc. 18, #137; 154; 156; 158).

True, each of the plaintiffs also allege that their information "was improperly accessed and obtained" by the hackers. (*Id.* at #154, 156, 158). But that is directly contradicted by the notice, which says only that the attack "may have affected" their information.[3] (*Id.* at #137). So the notice does plaintiffs no good. They need to have alleged some other, additional reason to believe they were in the unlucky part of the class.

To that end, Webber and Pierce's further allegations about actual misuse are once again their saving grace. Those allegations take Webber and Pierce's potential future injury beyond the mere possibility raised by the notice, making it at least

[3] "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (quoting *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998)) (collecting cases).

plausible that their SSN was exposed. *See Munger v. Matco Tools Corp.*, No. 5:23-cv-337, 2026 WL 1223399, at *6 (N.D. Ohio May 5, 2026). So, for them, this factor favors standing. But for Washburn, again, it does not.

On balance, then, Webber and Pierce have plausibly alleged a substantial risk of future injury. Thus, the Court can proceed to the merits of their damages claims for injuries flowing from that risk. But as both the second and third factor weigh against finding likelihood and imminence for Washburn, she lacks standing to recover for those losses.

#### c. Most of Plaintiffs' Injunctive Relief Claims Fail Because Their Requested Relief Does Not Redress a Likely or Imminent Future Injury.

Plaintiffs' requested injunctive relief presents a few different questions. They have thirteen separate requests. Recall that each of them must remedy ongoing or likely future harm. *Lyons*, 461 U.S. at 102. The vast majority fail that test.

Twelve of them are "forward-looking preventative remedies" that "will do nothing to redress' the 'already-occurred injury' of unauthorized access to" plaintiffs' PI. *Mercy Health*, 2025 WL 1827804, at *7 (quoting *Bowles v. Whitmer*, 120 F.4th 1304, 1311 (6th Cir. 2024)). Those ask the Court to require CPS to:

> (1) [not to] engag[e] in the wrongful and unlawful acts described [in the complaint], (2) protect … all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws, (3) delete, destroy, and purge the [PI] of Plaintiffs and Class members, (4) implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the [PI], (5) [not to] maintain[] the [PI] of Plaintiffs and Class members on a cloud-based database, (6) engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing and … to promptly correct

> any problems or issues detected …, (7) engage independent third-party security auditors and internal personnel to run automated security monitoring, (8) audit, test, and train its security personnel regarding any new or modified procedures, (9) segment data by … creating firewalls and access controls so that if one area of [CPS's] network is compromised, hackers cannot gain access to other portions of [CPS's] systems, (10) conduct regular database scanning and security checks, (11) implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor [CPS's] information networks for threats … and assess whether monitoring tools are appropriately configured, tested, and updated, … (13) implement logging and monitoring programs sufficient to track traffic to and from [CPS's] servers; and for a period of 10 years, appoint[] a qualified and independent third-party assessor to conduct an attestation on an annual basis to evaluate [CPS's] compliance with the terms of [the order], to provide [a] report to the Court and to counsel for the class, and to report any deficiencies with compliance ….

(Doc. 18, #175–78 (citation modified)).

To get any of that relief, plaintiffs would have to plausibly plead that "*another data breach* is 'imminent.'" *Mercy Health*, 2025 WL 1827804, at *7 (citing *Mikel v. Quin*, 58 F.4th 252, 258 (6th Cir. 2023)). They don't do so. They merely allege that data breaches are common and that holders of PI generally face a serious risk of cyberattacks. (Doc. 18, #140–42). But it is "unreasonable to infer" from these allegations that CPS "faces a higher risk of a future cyberattack than 'virtually every holder of private data.'" *Mercy Health*, 2025 WL 1827804, at *7 (quoting *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 378 (1st Cir. 2023)). So plaintiffs lack standing to seek the twelve proposed orders quoted above.

Plaintiffs' remaining requested injunctive relief, number twelve in their list of thirteen, would require CPS to "meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential [PI] to third parties, as well as the steps affected individuals must take to protect themselves." (Doc. 18,

#177). That relief is at least addressed to the harm plaintiffs are suing about—the breach that already happened. So the analysis of whether these plaintiffs can seek it is the same one the Court earlier performed in assessing whether they faced a likely and imminent future harm. Thus, Webber and Pierce, but not Washburn, have standing to seek only this form of injunctive relief.

#### d. Plaintiffs Do Not Allege a Cognizable Privacy Injury.

Plaintiffs also argue that they have suffered concrete privacy injuries that support their standing to sue. (Doc. 40, #358–59). To see whether that is so, the Court, as laid out above, must examine whether plaintiffs' injuries have a "close historical or common-law analogue." *TransUnion*, 594 U.S. at 424. Again, that means a common-law harm that is similar in "*kind*," but not necessarily "*degree*," to plaintiffs' alleged harms. *Dickson*, 69 F.4th at 344 (quoting *Gadelhak*, 950 F.3d at 462).

The Court recently reviewed the relationship between common law privacy injuries and the harm flowing from a data breach. *See Tate II*, 2026 WL 2794795, at *8–9. Much of that analysis is relevant here. Start at the beginning: The Supreme Court has held that the privacy torts are eligible comparators for this test, so there is no need to evaluate their historical pedigree. *See TransUnion*, 594 U.S. at 425. Relevant to this case are two tort causes of action that protect privacy interests: (1) public disclosure of private facts, *see* Restatement (Second) of Torts § 652D (A.L.I. 1965), and (2) intrusion upon private affairs, *see id.* § 652B. Both of those torts protect private or intimate information, but they do so in different ways: the former makes public dissemination of that information actionable, and the latter does so for

unauthorized and unreasonable access to that information. *Tate II*, 2026 WL 2794795, at *8. Plaintiffs here do not plausibly allege that they suffered a privacy injury analogous to either of those harms.

Take public disclosure of private facts. The *Tate* plaintiffs, who had suffered a data breach, did not allege publication, so they could not rely on public disclosure of private facts. *Tate v. EyeMed Vision Care, LLC (Tate I)*, No. 1:21-cv-36, 2023 WL 6383467, at *4 n.9 (S.D. Ohio Sep. 29, 2023). The same is true here. Plaintiffs, if by implication, do allege that some of their information was published. (*See* Doc. 18, #148–49 (alleging that criminals expose data relevant to stealing an individual's identity)). But the kinds of data relevant there—SSNs, addresses, names, and DOB—are not like the intimate or embarrassing information that the privacy torts protect. *See* Restatement (Second) of Torts § 652D cmt. b. And even if they were, publication in this context requires exposure to the public at large, not mere publication on the black market. *See Tate II*, 2026 WL 2794795, at *8 & n.2 (collecting cases).

Plaintiffs fare no better in showing an analogy to intrusion on private affairs. Admittedly, that tort does not require publication, so the lack of publication described above does not hurt them here. *See id.* at *8. Rather, the problem here is the nature of the information allegedly exposed. This tort applies only to private, personal information, access to which would be "highly offensive to a reasonable person." *Id.* at *8 (quoting Restatement (Second) of Torts § 652B). Here, plaintiffs merely allege that some combination of the data listed in the notice was exposed to hackers. The Court has explained how Webber and Pierce add allegations of misuse that provide a

reason to think their SSNs and other identifying data were exposed, while Washburn has not. But no plaintiff affirmatively alleges that intimate records of things like medical diagnoses and treatment records were exposed. And that is the only class of information implicated here whose exposure might trigger the shame and humiliation relevant to intrusion on private affairs. *See* Restatement (Second) of Torts § 652B cmt. b. And no plaintiff offers additional allegations that might take that mere possibility into the realm of the plausible. *See Twombly*, 550 U.S. at 557.

So plaintiffs simply have not alleged facts that support an inference that the hackers published or even accessed their intimate medical information. That is fatal to their attempted analogy to the privacy torts.

**e. Plaintiffs Do Not Plausibly Allege a Cognizable Injury Based on the Value of their Private Information or their Loss of the Benefit of the Bargain.**

Finally, plaintiffs assert two more injuries: (1) diminution of value of their private information, (Doc. 18, #150–52), and (2) loss of the benefit of the bargain, (*id.* at #153–54). Neither of those can supply standing here.

Start with plaintiffs' diminution of value theory. They allege that their PI is "valuable property." (*Id.* at #150). And plaintiffs allege that, as a result of the data breach, their PI's market value was damaged. (*Id.* at #152). They also allege that an individual "can actually sell their non-public information directly to a data broker." (*Id.* at #151).

Those allegations don't explain how plaintiffs are injured by this fact. It's true, of course, that PI is valuable. But, even accepting plaintiffs' allegation that they could

individually sell their PI on the open market, plaintiffs "do not allege that they planned to make such a sale." *Tate I*, 2023 WL 6383467, at *5. And even if they had, they don't explain how or why they would get less in exchange because of the breach. It is hard to imagine that data brokers would find it efficient to discriminate between individuals based on investigations into whether a given person's PI is compromised. And that is not the case for the closest comparator to hand—the implicit exchange of PI for services such as access to a website. *See id.* So without allegations that plaintiffs actually will get less for their PI than they otherwise would have in a planned transaction, this purported injury does not suffice for standing.

Now consider plaintiffs' benefit-of-the-bargain theory. An immediate objection to this argument is that, because plaintiffs never contracted with CPS, there was never a bargain whose benefits they could reap. Beyond that, to the extent plaintiffs seek to vindicate the benefit of their healthcare providers' bargains with CPS, they lack standing to assert that interest. Plaintiffs do allege that they provided their information with the "mutual understanding" that CPS would keep it secure. (Doc. 18, #135–36, 140). But that is inconsistent with plaintiffs' fundamental factual story—that they provided the information to their healthcare providers who in turn provided it to CPS. (*See id.* at #135). So the "mutual understanding" allegation amounts to little more than a "threadbare recital[]" of the essential contract element of mutual assent. *Iqbal*, 556 U.S. at 663. Plaintiffs do not allege any facts that might support an inference that CPS's data breach deprived them of the benefit of any bargain, so this claimed injury cannot support standing.

* * *

In sum, Washburn lacks standing altogether, while Webber and Pierce have standing for some of the claims and some of the forms of relief they seek. In particular, Webber and Pierce have plausibly alleged standing for their claims based on several of the actual misuses of their data, their concrete losses traceable to their risk of identity theft and fraud, and their one injunctive relief claim aimed at this data breach.

## B. The Merits

Having concluded that two plaintiffs have standing as to at least some of the relief they seek, the Court moves on to CPS's 12(b)(6) motion.[4] Plaintiffs have requested dismissal without prejudice of three of their claims; so the only remaining claims are for negligence (not per se) and unjust enrichment. CPS says plaintiffs fail to state a claim on both. As explained below, the Court concludes that (1) plaintiffs successfully state a claim for negligence under New York law, (2) fail to do so under Ohio law, (3) the Court should defer choosing the law applicable to the negligence claim until there has been more discovery, and (4) plaintiffs fail to state a claim for unjust enrichment under either New York or Ohio law, so the Court will dismiss that claim.

[4] In addressing the motion, the Court of course only considers the claims over which it has jurisdiction, i.e., Webber's and Pierce's.

### 1. Negligence

As every first-year law student learns, a plaintiff alleging negligence must show a duty that the defendant owes to the plaintiff, a breach of that duty, and that the breach proximately caused a resulting injury. *Rieger v. Giant Eagle, Inc.*, 138 N.E.3d 1121, 1125 (Ohio 2019); *Ferreira v. City of Binghamton*, 194 N.E.3d 239, 245 (N.Y. 2022) ("(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom") (quoting *Solomon v. City of N.Y.*, 489 N.E.2d 1294, 1294 (N.Y. 1985)).

Plaintiffs allege that CPS, after collecting their PI, owed a duty of reasonable care to protect and secure that data from the foreseeable harm of a data breach. (Doc. 18, #164–66). And they allege that CPS breached this duty by failing to follow adequate security measures and monitor their network's security, culminating in the data breach. (*Id.* at #165–66). They say all this proximately caused their injuries because data breaches are foreseeable and so, in turn, are the resulting injuries here. (*Id.* at #166–68). In its motion, CPS contests duty, breach, and injury.

#### a. Duty & Breach

Start with whether CPS had a duty to protect plaintiffs' information. Plaintiffs have abandoned their negligence per se argument, at least for now, so that leaves the common law as a potential source of duty here. (Doc. 40, #352 n.2). Plaintiffs have several theories for establishing duty: they argue first that CPS has a general duty to refrain from "creating a foreseeable risk" to others; second, they argue that CPS voluntarily undertook to protect plaintiffs' data when it collected the information. (*Id.*

at #365–67). Plaintiffs also allege that they and CPS had a special relationship, giving rise to a duty of care. (Doc. 18, #165).

As a general matter, there is no such thing as a "duty to act affirmatively for the protection of others." *Jackson v. Forest City Enters., Inc.*, 675 N.E.2d 1356, 1358 (Ohio 8th Dist. 1996). That is, when "harm to another is foreseeable" merely "as a result of a failure to act," the law does not recognize a "duty to prevent harm." *Id.* (citing Restatement (Second) of Torts § 314); *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1062 (N.Y. 2001) (noting that "a duty and the corresponding liability it imposes do *not* rise from mere foreseeability of the harm"). So plaintiffs' claim that general reasonableness principles support duty here will not fly.[5] They need something more.

On that note, the Court turns to plaintiffs' arguments that CPS has a special duty to protect their data. Start with whether CPS voluntarily undertook a duty to protect the information. As a general matter, an actor cannot be liable on this theory unless they explicitly undertook to provide the protective services in question. *See* Restatement (Second) of Torts § 323; *Espinal v. Melville Snow Contractors, Inc.*, 773 N.E.2d 485, 487 (N.Y. 2002); *Carter v. Reese*, 70 N.E.3d 478, 482 (Ohio 2016) ("[O]ne who voluntarily … renders services to another for the protection of the other person is liable at common law for injuries resulting from his failure to exercise reasonable

---

[5] One of plaintiffs' supplemental authorities, *In re Ohio Marijuana Card Data Breach Litig.*, holds that Ohio law supplies a duty of care on these facts based on general foreseeability principles. ___ F. Supp. 3d ___, 2026 WL 2634838, at *16–17 (N.D. Ohio 2026). Because that case does not grapple with the limits discussed here, the Court does not find it persuasive.

care under the circumstances.”). Plaintiffs do not allege that CPS overtly undertook to protect their data as a service to them.[6] Rather, plaintiffs merely allege that they entrusted the information to CPS and that CPS knew that it was risky to not protect it. (Doc. 18, #164). And, as the Court explained earlier in rejecting plaintiffs’ benefit-of-the-bargain theory of standing, plaintiffs also do not allege that CPS assumed a contractual duty to protect the data. So that route to establishing a duty is out.

Plaintiffs have another option—showing a special relationship. The standards differ between Ohio and New York, so the Court addresses the two states’ laws separately. Start with Ohio. Beyond a voluntary undertaking, the only other potentially relevant method of establishing a duty of protection in Ohio is to show “a special relationship justifying the imposition of a duty.” *C.L. v. McFadden*, 2026-Ohio-1150, ¶ 20 (10th Dist.) (quoting *Carter*, 70 N.E.3d at 482). Traditionally, there are five “special and definite relationships” that can create a duty: “(1) common carrier and its passengers, (2) innkeeper and guests, (3) possessor of land holding it open to the public and those who enter in response to the invitation … (4) custodian and [confined individual], and (5) employer and employee.” *Masterson v. Brody*, 196 N.E.3d 927, 935–36 (Ohio 8th Dist. 2022).

[6] Plaintiffs allege that CPS “made promises and representations” that the PI “would be kept safe and confidential.” (Doc. 18, #135). It’s unclear what exactly CPS would need to have said for plaintiffs’ theory to work, but the only quoted language plaintiffs provide is clearly *not* an affirmative undertaking. They quote from CPS’s then-operative privacy notice, which says “We recognize that the privacy of your information is important … It is our policy to protect the confidentiality of [SSNs] that we receive or collect in the course of business.” (*Id.* at #135 n.5). So to the extent plaintiffs allege that this was a promise to keep their information safe, that allegation is contradicted by their supporting record. *See supra*, Part A.2.b. n.3.

None of those appear analogous to the relationship between plaintiffs and CPS. True, in a roundabout way, plaintiffs are CPS's customers, but that's a far cry from saying CPS is a common carrier—"[a] commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee." *Common Carrier*, *Black's Law Dictionary* (10th ed. 2012). And the Court's role here is not to develop the law of Ohio, so without even a colorable analogy, plaintiffs do not plausibly allege a special relationship under that state's law.

What about New York? Whether that state's law obligates a defendant to "protect [a] plaintiff from the conduct of others" depends on whether "the defendant is in the best position to protect against the risk of harm," and whether imposing the duty raises "the specter of limitless liability." *Hamilton*, 750 N.E.2d at 1061. Providing examples of such relationships, the *Hamilton* court explained that defendants are in the best position to prevent harm and liability is reasonably "circumscribed by the relationship" for relationships between "master and servant, parent and child, and common carriers and their passengers." *Id.* So, however expansively one could interpret the standard, the heartland of its application is the same traditional relationships that have always supported a duty. *See id.* at 1061–62. And those traditional relationships, as noted above, are not at play here.

But the standard itself turns on (1) who is in the better position to avoid the harm, and (2) whether recognizing a duty could give rise to "limitless liability." So how do those two factors play out here? To the question of whether CPS is best-positioned to prevent data-breach losses, it is notable that plaintiffs are essentially

at CPS's mercy once their healthcare providers entrust it with their data. That is because CPS alone has the power to employ adequate security measures for their email accounts. On top of all that, plaintiffs have practically no choice in the matter. The only thing they could have done here to avoid giving CPS their data would be to forgo obtaining healthcare from CPS's clients. (*See* Doc. 18, #139). As the New Your Court of Appeals put it, "we assign the responsibility of care to the person or entity that can most effectively fulfill that obligation at the lowest cost." *Davis v. S. Nassau Cmties. Hosp.*, 46 N.E.3d 614, 618 (N.Y. 2015). It's hard to deny that CPS was the lowest cost avoider here. That cuts in favor of finding a duty under New York law.[7]

Turn next to the second consideration—excessively broad liability. In their brief CPS argues that "[i]mposing a duty on downstream service providers like CPS where it merely processed Plaintiffs' data would create precisely the 'limitless liability' *Hamilton* warns against." (Doc. 30, #281). This result, CPS says, would make "every company that stores information into a de facto insurer against criminal hacking." (*Id.*). That latter point may be right, but the former misses the mark.

*Hamilton* found no special relationship between gun manufacturers and "any of the thousands of victims of gun violence." 750 N.E.2d at 1061. That was because they were separated by "several links in a chain consisting of at least the

[7] Further suggesting that CPS may be "better positioned" to address data security concerns, it presumably has an incentive to take care independent of any duty that may arise based on it maintaining plaintiffs' data. After all, plenty of other confidential company information presumably is accessible through CPS's email accounts. Of course, that incentive proved insufficient here, but that will always be the case when an avoidable harm occurs. The question in allocating liability under New York law, at least at this stage of the analysis, is who was better positioned to prevent it. The point here is simply that the independent incentive that CPS has may be helpful in answering that question, as well.

manufacturer, the federally licensed distributor or wholesaler, and the first retailer," to say nothing of "numerous subsequent legal purchasers or even a thief." *Id.* at 1062. Recognizing a relationship there, the court concluded, would be akin to recognizing a relationship between the owner of an apartment building and "the millions of individuals who use the sidewalks … and are thereby exposed to the dangers of street crime." *Id.* at 1061; *see also Waters v. N.Y. City Hous. Auth.*, 505 N.E.2d 922, 924–25. And the court shied away from imposing such broad notions of liability.

CPS's situation, by comparison, is not as outrageously unfair. Imposing a duty on a defendant that collects private information from the consumers it serves, even if only as a third party to the relationship between those consumers and the defendant's real clients, would leave at least some constraints on that defendant's liability. The collector of private information would only be responsible for protecting the data of consumers who it willingly took on in connection with its clients. So it is true that CPS, as it says, is a "downstream service provider." (Doc. 30, #281). But that does not mean it has merely a remote connection with plaintiffs or that its potential liability is boundless. CPS could plausibly limit its potential liability by storing less information, which obviously distinguishes it from a gun manufacturer that lacks power to control how its customers use the product it has provided. *Cf. Hamilton*, 750 N.E.2d at 1061. To confirm this instinct, courts applying this test in data breach cases

(including courts far more familiar with New York law than this one) have found a duty.[8]

So plaintiffs plausibly allege that CPS had a duty under New York law to protect their private information with reasonable care.

### b. Breach, Causation and Injury

That leaves the remaining three elements, for which the Court need only address New York law. The Court concludes that plaintiffs have at least plausibly alleged all of these.

Start with breach. To show that CPS did not exercise reasonable care in protecting their data, plaintiffs point to a variety of alleged shortcomings. Overall, they charge that CPS's "failure to … maintain adequate data security measures" for their PI. (Doc. 18, #152). Getting more specific, they allege that CPS should have "encrypt[ed] the information" and "delet[ed] it when it [was] no longer needed." (*Id.* at #138). It is at least plausible that CPS was unreasonable in failing to employ these specific measures (if in fact it failed to employ them). So, while CPS may be right that plaintiffs' rote allegations about "inadequate security practices," (*id.* at #166), are insufficient under *Twombly* and *Iqbal*, (Doc. 30, #277, 283), plaintiffs elsewhere allege specific shortcomings that could constitute breach. Plaintiffs have thus plausibly alleged breach.

---

[8] *See Rand v. Travelers Indem. Co.*, 637 F. Supp. 3d 55, 69 (S.D.N.Y. 2022); *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 594 (S.D.N.Y. 2022); *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 469 (S.D.N.Y. 2022).

Move on then, to the interlocking elements of injury and causation. Recall that two plaintiffs have standing related to alleged increased scam communications, other examples of actual misuse of their data, lost time and effort in mitigating the data breach's impact, and emotional distress from their risk of financial fraud and identity theft. That tees up two questions: (1) whether at least some of these injuries are cognizable in a negligence case, and (2) whether CPS's alleged breach of duty caused those cognizable injuries.

The Court begins with the former. CPS argues that none of plaintiffs' claimed injuries "constitutes the concrete, legally cognizable damages necessary to sustain a negligence claim."[9] (Doc. 30, #287). But, as other courts have noted, "time and money spent attempting to mitigate fraud, 'ongoing, imminent, and impending threat[s] of identity theft crimes,' and 'decreased credit scores and ratings'" can satisfy the injury requirement. *Lazar v. Int'l Shoppes, LLC*, No. 24-4170, 2025 WL 1475627, at *3 (E.D.N.Y. May 22, 2025) (quoting *In re GE/CBPS Data Breach Litig.*, No. 20 Civ. 2903, 2021 WL 3406374, at *9 (S.D.N.Y. Aug. 4, 2021)). And plaintiffs, as discussed throughout, plausibly allege that they spent time and money on mitigation efforts. So they satisfy the injury element and the Court leaves for another day whether their other alleged injuries could support a negligence claim.

Last up is causation, which has two pieces: cause in fact and proximate cause. The former is plausibly alleged here for the same reasons plaintiffs satisfy the

[9] CPS also argues that plaintiffs' claims are barred by the economic loss rule. (Doc. 42, #422–24). However they only invoke Ohio's version of that doctrine, so the Court need not address it here.

traceability element of standing. *See supra*, Part A.2. The latter however is "not so handily applied." *Hain v. Jamison*, 68 N.E.3d 1233, 1238 (N.Y. 2016). Proximate causation exists if the "defendant's negligence … is 'a substantial cause of the events which produced the injury.'" *Id.* at 1237 (quoting *Mazella v. Beals*, 57 N.E.3d 1083, 1090 (N.Y. 2016)). Where "the acts of a third person intervene between the defendant's conduct and the plaintiff's injury," proximate cause depends on whether the act was "foreseeable in the normal course of events." *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980).

That last point shows why plaintiffs succeed in alleging proximate cause here. Plaintiffs made detailed allegations about the foreseeability of third-party conduct. First, "[d]ata thieves regularly target entities in possession of healthcare data," which explains why CPS, taking all allegations as true, invited a data breach. (Doc. 18, #140). Second, "[c]riminals monetize the data by selling … [it] on the black market to other criminals who then" use it to commit identity theft. (*Id.* at #149). So both sets of third-party intervenors are predictable here—or at least plausibly alleged to be so. And as the Court explained above, the availability of other information makes identity theft at least a plausible result of this data breach even though, in itself, it may not have implicated sufficient information to defraud plaintiffs.

So plaintiffs plausibly allege each element of negligence under New York law, but fail to allege duty under Ohio law.

### c. Choice of Law

Because the claims could proceed under New York law, but not Ohio law, choice of law matters greatly. So that is the topic to which the Court turns next. And to choose the applicable law, the Court applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). For this Court, that's Ohio.

For tort issues, Ohio follows the Second Restatement's approach. *Morgan v. Biro Mfg. Co., Inc.*, 474 N.E.2d 286, 289 (Ohio 1984); *see also* Restatement of the Law (Second) of Conflict of Laws §§ 6, 145 (A.L.I. 1971). What this means is that "the law of the place of injury [presumptively] controls unless another jurisdiction has a more significant relationship to the lawsuit." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) (quoting *Morgan*, 474 N.E.2d at 289). Here, plaintiffs suffered their injuries in New York. So the question is whether Ohio nonetheless has a more significant relationship to the lawsuit.[10]

To figure that out, consider the "relative importance … with respect to the particular issue" of (1) "the place where the injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the [citizenship and location] of the parties," and (4) "the place where the relationship, if any, between the parties is

[10] Some courts have held that, in this context, the place of injury (i.e., the place of the "last event necessary for a defendant to be liable for negligence") is wherever the data breach happened. *See, e.g.*, *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 675 (D.S.C. 2021). But the claimed injuries here did not happen instantaneously upon the data breach occurring. The negligence claim did not accrue until plaintiffs received the scam calls, took steps to mitigate their risk of identity theft, and experienced emotional distress. That all happened in New York.

centered." Restatement of Conflicts § 145; *Morgan*, 474 N.E.2d at 289 & n.5. As Ohio applies the test, the next and last step is to consider the relevance of any of the dread choice-of-law principles listed in § 6 of the Restatement.[11] *Morgan*, 474 N.E.2d at 289.

On their own, the first four factors do not move the ball much either direction. As discussed, the place of the injury here is New York, so the first factor favors New York law. But the conduct causing the injury (i.e., CPS's alleged failure to properly secure plaintiffs' data) seemingly took place in Ohio, where CPS is headquartered. That said, it's not totally clear from the pleadings "where" CPS stores the data and where it makes data security decisions. So the second factor possibly favors Ohio law, but it could also favor some other state's law. Turning to the third factor, CPS is located in Ohio, and plaintiffs are in New York, so it is neutral. And the parties do not have much of a preexisting relationship, making the fourth factor likewise neutral. That would seem to put the case at an impasse, suggesting that the presumption that the law of the place of injury applies has not been rebutted. *See id.*

But here, the second factor—the place of conduct—may be more important "with respect to the particular issue." *Id.* Ohio and New York seemingly have divergent public policies. Ohio courts are loathe to impose duties to protect others from the misconduct of third parties, even where the harm is foreseeable. *See Masterson*, 196 N.E.3d at 935–36. New York courts, by contrast, are willing to find

[11] Those are (1) "the needs of the interstate and international systems," (2) "the relevant policies of the forum," (3) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," (4) "the protection of justified expectations," (5) "the basic policies underlying the particular field of law," (6) "certainty, predictability and uniformity of result," and (7) "ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2).

such duties so long as the defendant is positioned to prevent the harm and imposing liability would not be peculiarly unfair. *See Hamilton* 750 N.E.2d at 1061. All of that is to say that "the relevant policies of the forum" state seem to reject negligence liability on facts like those here, while the policies of the "other interested state[]" seem to favor it. Restatement of Conflicts §§ 6(2)(b), (c). The conflict, then, is over conduct regulation, and it strikes the Court as reasonable that the state with the strongest natural interest in defining whether conduct is tortious is the state where the conduct occurred. *See In re MOVEit Customer Data Sec. Breach Litig.*, No. 23-md-3083, 2025 WL 2176590, at *7 (D. Mass. July 31, 2025) (applying the law of the place of conduct in a data breach case because that state's "interest in having [defendant] comply with its own tort principles governing cybersecurity is greater than the interest of each Plaintiff's home state in seeing their residents compensated").

Still, two things cause the Court to pause before holding that Ohio law applies to plaintiffs' negligence claim. First, this is a difficult issue, and one on which the Court has not received any real briefing from the parties. Second, the crucial question of where the relevant conduct occurred (i.e., where CPS made its decisions about data security) is not clearly answered by the pleadings. Given those issues, the Court concludes that it should not rule on the choice-of-law issue until there has been some further factual development and an opportunity for the parties to state their views. *See Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 718–19 (6th Cir. 2015); *Alford v. Beechmont II Leasing Co., LLC*, No. 1:23-cv-63, 2024 WL 232294, at *1 (S.D. Ohio Jan. 22, 2024). So the Court leaves the ultimate determination for another time.

**2. Unjust Enrichment**

Plaintiffs' only other remaining claim—for unjust enrichment—fails regardless of what law the Court applies. Unjust enrichment or quasi-contract liability under Ohio law requires a plaintiff to show: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Padula v. Wagner*, 37 N.E.3d 799, 813 (Ohio 9th Dist. 2015) (quoting *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)). New York's requirements are similar; there, a plaintiff must show that "(1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (citation modified). The New York Court of Appeals has clarified that the thing "sought to be recovered" in the third element is "the benefit" that had "been conferred on the defendant," rather than anything the plaintiff wants. *Paramount Film Distrib. Corp. v. New York*, 285 N.E.2d 695, 698 (N.Y. 1972).

Applying those tests, plaintiffs' unjust enrichment claim fails. Take the first element. Plaintiffs arguably did not confer a benefit on CPS, if there was a benefit at all, because they have no direct relationship with CPS. *See Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (holding that indirect purchasers cannot assert claims for unjust enrichment); *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (holding that the relationship between plaintiff and defendant cannot be overly attenuated). But there's no need to wade into the murky waters of

whether a direct relationship is necessary. That is because plaintiffs did not confer a benefit on CPS in any event. CPS does not reap a benefit from plaintiffs merely by collecting their PI; at least not without more. *Haney v. Charter Foods N., LLC*, 747 F. Supp. 3d 1093, 1113–14 (E.D. Tenn. 2024). For this theory to work, plaintiffs would need to allege that CPS used their data for some purpose beyond providing pharmacy services (i.e., that CPS received some benefit beyond the benefit that arose from the expected use of the information), not merely that the data had some value. *See id.*; *Mercy Health*, 2025 WL 1827804, at *12; *In re NCB Mgmt. Servs., Inc. Data Breach Litig.*, 748 F. Supp. 3d 262, 278 (E.D. Pa. 2024) (holding that PI is valuable only to "a business that commoditizes it or receives an independent pecuniary benefit from holding" it).

Plaintiffs have another theory. They argue alternatively that the benefit CPS received was not the PI itself. Rather, CPS "enriched itself by saving the costs it reasonably should have expended on data security measures to secure" the data. (Doc. 18, #174). This argument also fails. That is because plaintiffs do not allege that they paid for data security measures—i.e., that CPS implicitly assented to perform those measures in exchange for the benefits it received from plaintiffs. They merely allege that CPS knew it was obtaining plaintiffs' PI. (*See id.* at #173). So, as with their failed benefit-of-the-bargain theory of standing, plaintiffs have not alleged that what they want, and what CPS failed to provide, was part of the bargain. *See Mercy Health*, 2025 WL 1827804, at *12; *Cahill v. Mem'l Heart Inst., LLC*, No. 1:23-cv-168, 2024 WL 4311648, at *13 (E.D. Tenn. Sep. 26, 2024).

* * *

To sum up, Webber and Pierce have standing to sue, and one of their claims survives, at least for now. Specifically, their negligence claim can proceed because they adequately allege that CPS owed them a duty to protect their information under New York law, and that CPS caused them harm by failing to meet that duty. However, they do not plausibly allege a duty under Ohio law. So, if after discovery, it turns out Ohio law applies, then plaintiffs' negligence claim will fail. Beyond that, their unjust enrichment claim fails because they do not plausibly allege that they conferred a benefit on CPS or that they bargained with CPS for data security services. So plaintiffs Webber and Pierce can proceed with their negligence claim.

## CONCLUSION

CPS's Motion to Dismiss (Doc. 30), is **GRANTED** in part and **DENIED** in part. Plaintiffs' negligence claim can proceed, at least for the time being, but all four remaining claims plaintiffs raise in the amended complaint (Doc. 18) are **DISMISSED WITHOUT PREJUDICE.** Beyond that, as the Court has now ruled on its motion to dismiss, CPS's Motion to Stay Discovery (Doc. 29), is **DENIED** as moot.

**SO ORDERED.**

November 16, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**